IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RON SMITH and LUCY SMITH,

     Plaintiffs,

vs.                                                                                    No. CIV 94-1083 MV/DJS

INGERSOLL-RAND CO.,

     Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Plaintiffs' Motion for Pre-Judgment and Post-Judgment Interest on the Compensatory and Punitive Damage Judgment Entered Against Defendant, Ingersoll-Rand Company, filed December 15, 1997 **[Doc. No. 318]**, Plaintiffs' Motion to Amend or Alter Judgment to Include Pre-Judgment and Post-Judgment Interest, filed December 31, 1997 **[Doc. No. 323]**, Plaintiffs' Objection and Appeal of Clerk's Order Settling Costs, filed July 7, 1998 **[Doc. No. 357]**, and Defendant Ingersoll-Rand Company's Motion for a New Trial, Renewed Motion for Judgment as a Matter of Law, and Motion for Remittitur, filed January 5, 1998 **[Doc. No. 326]**. Having conducted evidentiary hearings, reviewed the responsive pleadings, relevant law, and being otherwise fully informed, the Court finds that the motion for pre-judgment and postjudgment interest [318] is well taken and will be **granted in part**, that the motion to amend the judgment [323] is well taken and will be **granted**, that the objection and appeal of the costs order [357] is well taken and will be **granted in part**, and that the motion for a new trial [326] is not well taken and will be **denied**.

## Background

On April 5, 1993, Plaintiff Ron Smith, then a 33-year old employee of Cutler Repaving Inc., suffered a severe injury when the right front wheel of an Ingersoll-Rand milling machine, owned by Cutler, ran over his right foot. This machine uses a cutting drum to remove sections of pavement so that streets can be refurbished with new material. Mr. Smith worked in close proximity to the machine as a groundman and controlled its cutting depth. Part of his duties included ensuring that long metal bars, called skis, properly rested on uncut pavement to accurately guide this cutting depth. The machine cut only when moving forward, and to position it for another pass its operator would raise the entire platform, drive in reverse, and at some point turn the machine onto uncut pavement. Under pressure from his employer to maintain high milling output, Mr. Smith frequently hammered on the grade control skis to force them down to ground level after the machine had been raised for the repositioning maneuver. It was during such a hammering procedure, taking place while the machine was moving in reverse, that the operator turned the machine, unaware of Mr. Smith's close proximity. Despite Mr. Smith's efforts at freeing himself, the machine's wheel pinned and crushed his right foot, causing extensive degloving injuries to his foot and severe lacerations to his right leg. The quick action of Mr. Smith's co-worker Mr. Andrew Madrid, in slowing or stopping Mr. Smith's bleeding likely saved Mr. Smith's life. As a result of the injury Mr. Smith sustained, however, doctors had to amputate, in several operations, his leg to a point well above the knee.

To say that Mr. Smith's life has changed dramatically since April 5, 1993 would be the palest of understatements. He and his physicians have testified to the extensive medical care, both physical and psychological, that he has required since his injury and will continue to require throughout his life. He, his 34-year old wife Lucy, and expert witnesses testified to the considerable, if not

irreparable, strain that his injury, convalescence, and new condition as an above-the-knee amputee have placed on his marriage.

After a trial lasting from November 4, to December 2, 1997, the jury entered a verdict in Mr. and Mrs. Smith's favor, finding that Mr. Smith had suffered damages in the amount of $8,529,465.20, Mrs. Smith in the amount of $1,279,192.51, assigning fifty percent liability to Ingersoll-Rand, and awarding Plaintiffs $17,460,000 as punitive damages.

During its deliberations, however, the jury asked for a large writing tablet, and without the Court's knowledge received in return an easel containing a notepad used during the trial, which inadvertently still retained nine pages of information written by Plaintiffs' counsel and Plaintiffs' expert Mr. Stan Smith in the course of trial. Court staff found the easel with all pages still attached but turned back so as not to be visible after the conclusion of deliberations and rendering of the verdict. The Court notified the parties of this discovery, and after discussion with counsel held an evidentiary hearing on February 13, 1998, where jury foreperson Mr. Daniel Rivera testified. Because Mr. Rivera's testimony was inconclusive as to jury exposure to the easel pages, however, the Court held a second hearing on February 25, 1998, asking juror Ms. Darla Ashley, who had been the jury's scribe and had written on the easel during deliberations, to testify. At these hearings the Court probed, consistent with Fed. R. Evid. 606(b), the extent of the jury's exposure, if any, to the easel pages. The Court admitted these pages into evidence as joint exhibits and sets out their content here in Appendix A.

**Discussion**

I.  Defendant's Motion for a New Trial, for Judgment as a Matter of Law, and for Remittitur

In this motion Defendant Ingersoll-Rand presents a slew of arguments.  Claiming that the Court should infer passion and prejudice on the part of the jury due to the size of the damages awards alone, Defendant also argues that the punitive damage component violates due process, citing <u>BMW of North America, Inc. v. Gore</u>, 517 U.S. 559 (1996), and <u>Continental Trend Resources, Inc. v. OXY USA, Inc.</u>, 101 F.3d 634 (10th Cir. 1996), <u>cert. denied</u>, 117 S.Ct. 1846 (1997).  Under this rubric Defendant argues that the jury failed to limit its award to New Mexico's concerns, that Ingersoll-Rand did not have fair notice of the possible severity of the penalty, that its conduct did not have a sufficient degree of reprehensibility to support the punitive damages amount, that the ratio of punitive to compensatory damages was excessive, and that the award in this case did not compare to civil and criminal penalties for comparable misconduct.  Ingersoll-Rand also advances that several of the Court's evidentiary rulings were in error, inviting the Court to reconsider these rulings, find in its favor and grant a new trial.  In addition, Defendant claims that the Court erred both in its understanding of New Mexico's law of punitive damages and in instructing the jury on that law, also arguing that in deciding not to install mirrors on its milling machines, Ingersoll-Rand made the type of good faith design choice that precludes an award of punitive damages.  Finally, Ingersoll-Rand argues as its first point that the jury's viewing of pages from the trial easel mandates a new trial.

The legal standards the Court must apply in addressing a motion for a new trial and a renewed motion for judgment as a matter of law differ.  Rule 59 itself, discussing the granting of new trials, provides amorphous guidance.  <u>See</u> Fed. R. Civ. P. 59(a).  Courts have, however, explained that a new trial is appropriate where the verdict is clearly, decidedly, or overwhelmingly against the weight

of the evidence.  <u>Considine v. Newspaper Agency Corp.</u>, 43 F.3d 1349, 1365 (10th Cir.1994).

Perhaps indicating a more lenient standard, less recent case law also holds that a new trial is

appropriate where a court deems that the ends of justice require it.  <u>Holmes v. Wack</u>, 464 F.2d 86,

88 (10th Cir. 1972).  Under either reading of controlling precedent fairness is a touchstone, however,

for a motion for a new trial invokes the discretion of a court "in so far as it is bottomed on the claim

that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other

reasons, the trial was not fair to the [moving] party."  <u>Montgomery Ward & Co. v. Duncan</u>, 311 U.S.

243, 251 (1940).[1]

Rule 50, on the other hand, applies both a stricter and more definite standard.  Under Rule

50 and its construing case law, when reviewing a motion for judgment as a matter of law, a court may

grant the motion "only if the evidence points but one way and is susceptible to no reasonable

inferences supporting the party opposing the motion."  <u>Mason v. Oklahoma Turnpike Authority</u>, 115

F.3d 1442, 1450 (10th Cir. 1997).  The Court can not weigh the evidence, pass on the credibility of

witnesses, or substitute its conclusions for that of the jury.  <u>Id.</u>; <u>Wolfgang v. Mid-America</u>

<u>Motorsports, Inc.</u>, 111 F.3d 1515, 1522 (10th Cir. 1997).

The Court's conclusion that the damages awards are not excessive makes it unnecessary to

consider remittitur issues.

---

[1]  In setting out in its brief the standard for a new trial based on Rule 59, Ingersoll-Rand argues that a court may order a new trial even where the verdict is supported by substantial evidence, citing <u>Lama v. Borras</u>, 16 F.3d 473, 477 (1st Cir. 1994).  Ingersoll-Rand fails to mention the counterbalancing language of <u>Lama</u>, found on the same page, which states that "where the verdict rests on substantial evidence, it is 'only in a very unusual case' that [an appellate court] will find that the district court abused its discretion by denying a new trial."  <u>Id.</u> (citations omitted).  Implicitly recognizing that the weight of the evidence in this case is against it, Ingersoll-Rand is urging the Court to apply the exception, not the rule.

Because so much of Ingersoll-Rand's argument is rooted in its claim that both compensatory and punitive damages are "shockingly excessive," the Court begins with this contention. In this diversity case, the Court must turn to New Mexico law to analyze an excessive damages claim, for "the role of the district court is to determine whether the jury's verdict is within the confines set by state law." Browning-Ferris Industries v. Kelco Disposal, 492 U.S. 257, 279 (1989).

A. The compensatory damages awards

The jury found that Ron Smith's damages totaled $8,529,465.20 while Lucy Smith's damages were in the amount of $1,279,192.51. Although the issue of future wage loss was hotly disputed at trial, Ingersoll-Rand here does not revisit this matter, arguing only that the award is unquestionably excessive in the face of evidence of $1.5 million "hard" damages[2] for Mr. Smith and $213,000 for Mrs. Smith. Reaching all the way back to Vivian v. Atcheson, Topeka and Santa Fe Ry. Co., 363 P.2d 620 (N.M. 1961), Ingersoll-Rand suggests that the Court should look to smaller verdicts in similar cases and conclude that the jury's decision here was so out of line as to merit the Court's corrective action.

Defendant fails to mention, however, that Vivian itself also urges moderation in overturning a jury's decision. Vivian does stand for the proposition that courts may compare verdicts with other cases, but Vivian also cautions that "each case must be determined upon its own facts and circumstances." Id. at 622. The equally distant case of Mathis v. Atchison, Topeka and Santa Fe Railway Co., 300 P.2d 482 (1956) explains that

---

[2] The Court presumes that by "hard" damages Ingersoll-Rand means damages that are capable of quantifiable proof, such as medical costs and loss of income, and that Plaintiffs sought to prove, not including pain and suffering and hedonic damages.

> [t]he fact that a verdict appears to be excessive is not a ground for a motion for a new trial. It is only when the excessive damages appear to have been given under the influence of passion or prejudice that a new trial may be granted for that reason. There is no standard fixed by law for measuring the value of human pain and suffering. In every case of personal injury a wide latitude is allowed for the exercise of the judgment of the jury, and, unless it appears that the amount awarded is so grossly out of proportion to the injury received as to shock the conscience, [the] court cannot substitute its judgment for that of the jury.

Id. at 487.

Applying this standard from New Mexico law the Court is convinced that Plaintiffs presented substantial evidence at trial from which the jury could arrive at the two damages figures, and easily concludes that the verdict is not against the weight of the evidence. Plaintiffs' exhibit 633 catalogs the numerous medical procedures Ron Smith underwent as a result of his accident and chronicles his extensive visits to psychologists and rehabilitation specialists. Dr. Allan Davis testified concerning the massive injuries Ron Smith sustained, explaining in detail the trauma that Mr. Smith received to his entire leg and the initial amputation of Mr. Smith's foot. Dr. Edward Atler described Mr. Smith's above-the-knee amputation and discussed successive operations to remove parts of his femur where bone spurs had developed, both to relieve pain and to help Mr. Smith be fitted for a prosthesis, and called Mr. Smith's stump the worst he has seen in his many years of practice. Dr. Atler also voiced his concern over the possibility of Mr. Smith's femur developing more bone spurs, thus necessitating further surgery, and stated that the bone spurs and blisters Mr. Smith had as a result of the wearing of his prosthetic limb were extremely painful. Dr. Richard Gobeille, the plastic and reconstructive surgeon who treated Mr. Smith, also testified. Dr. Gobeille explained how he implanted a tissue expander in Mr. Smith in order to obtain enough skin from the hip area to graft onto the stump, and also testified as to the several grafting procedures Mr. Smith underwent before a satisfactory graft

was achieved. Dr. Gobeille and prosthetist Nathan Myers both explained to the jury the difficulties Mr. Smith was having and would have with the fit of his prosthetic limb. Dr. Gobeille opined that Mr. Smith's wearing of his prosthesis would, due to the nature of his injuries, hamper the stabilization of his stump. Lucy Smith testified on Mr. Smith's anguish at waking up in the hospital five days after his accident to find his right leg missing. Lucy Smith also described Mr. Smith's frequent nightmares, where he would wake up after re-living the accident in his sleep.

Aside from the medical difficulties created by Mr. Smith's accident, other experts testified that Mr. Smith had and continues to have significant psychological difficulties. Dr. Barry Irons testified that Mr. Smith suffered from major depression resulting from his accident. Dr. Thomas Thompson stated that Mr. Smith had considerable difficulty adjusting to his amputation and was clearly suffering from depression. Dr. Thompson unequivocally diagnosed Ron Smith as afflicted with recurrent major depression and chronic post traumatic stress disorder, describing in detail Mr. Smith's symptoms. Dr. Thompson and Dr. James Varni both testified on the difficulties that Ron and Lucy Smith were having in their marriage as a result of Mr. Smith's injuries and psychological difficulties. Dr. Varni explained at length that in his opinion Mr. Smith would have life-long counseling needs. Although Ingersoll-Rand rebutted these expert testimonies in its case in chief through its witnesses Dr. James Rosenberg and Dr. Timothy Strongin, the jury had more than enough evidence from which to decide the extent of Mr. Smith's compensatory damages. The jury's verdict, therefore, was not out of proportion to the injury received. Since the amount of the verdict does not shock the Court's conscience, the Court will not step in to alter the jury's decision.

Moreover, the Court would come to the same conclusion concerning Mr. Smith's compensatory damages if it compared verdicts from other cases. Ingersoll-Rand repeatedly urges

such comparison, yet studiously avoids mention of the recent <u>Rogers</u> case. The Court, however, need go no further afield than <u>Rogers</u> in its verdict comparison. In <u>Rogers</u>, as in this case, a ground crew member was severely injured when an Ingersoll-Rand milling machine, moving in reverse, ran over her. <u>Rogers v. Ingersoll-Rand Co.</u>, 971 F. Supp. 4, 8 (D. D.C. 1997), <u>aff'd</u> 144 F.3d 841 (D.C. Cir. 1998). In <u>Rogers</u>, as in this case, visibility hampered safety with tragic consequences. <u>Id.</u> Where Mrs. Rogers suffered an amputation to her left leg, severe pelvic injury, and a changed lifestyle that saw her, in part, temporarily lose the custody of her four children, <u>id.</u>, the <u>Rogers</u> jury awarded her $10,200,000 in compensatory damages. <u>Id.</u> at 18. Although Mr. Smith's circumstances differ he too sustained extensive injuries, and given the size of the <u>Rogers</u> damages the Court can not conclude that it should disturb Mr. Smith's compensatory damages award.

Likewise, the jury had sufficient evidence before it to find that Lucy Smith had suffered the damages it assigned her. Ingersoll-Rand does not contest the economic damages Mrs. Smith suffered in terms of lost wages and counseling. Defendant argues, however, that Mrs. Smith's loss of consortium award is excessive. Pointing out that New Mexico has only recently adopted loss of consortium as a theory of tort recovery, Ingersoll-Rand asks the Court to compare consortium verdicts from other jurisdiction and conclude that the present one is excessive. Yet as the Court has pointed out, New Mexico looks to individual circumstances and allows wide latitude in jury verdicts. This jury heard both Ron and Lucy Smith as well as several expert witnesses testify on the considerable strain Mr. Smith's injury brought to their relationship. At times Plaintiffs were excused from the courtroom so that psychological experts could speak candidly and indeed poignantly about the frailty of the marriage bond. In the face of this evidence the Court finds Ingersoll-Rand's argument that all is not so precarious, as evidenced by Mr. Smith's fathering two children since the

accident, as thin at best. Given that loss of consortium is "simply the emotional distress suffered by one spouse who loses the normal company of his or her mate when the mate is physically injured due to the tortious act of another," Romero v. Byers, 872 P.2d 840, 843 (N.M. 1994), the jury heard ample evidence of emotional distress, sufficient enough to allow it to arrive at its conclusion.

Lastly, Ingersoll-Rand contends that Mr. Smith's injuries made him a sympathetic plaintiff, stating that because some of the jurors showed emotion during some of Ron Smith's testimony, the verdict was the result of passion or prejudice. The Court disagrees. The Court presumes that the jury followed its instructions. Webb v. ABF Freight Systems, Inc., 155 F.3d 1230 (10th Cir. 1998). Here the Court instructed the jury four times to avoid passion or prejudice, in instructions numbers 2, 14, 40, and 41. In a case with dramatic injuries such as this one, the law does not require that jurors observe absolute stoicism. See Mason v. Texaco, Inc., 741 F. Supp. 1472, 1517-18 (D. Kan. 1990), aff'd in part and remanded in part, 948 F.2d 1546 (10th Cir. 1991). Because the verdict is grounded in substantial testimony to support it, the Court does not find that the verdict "is so plainly excessive as to suggest that is was the product of passion or prejudice on the part of the jury." Malandris v. Merrill Lynch, Pierce, Fenner & Smith, 703 F.2d 1152, 1168 (1981), cert. denied, 464 U.S. 824 (1983).

B. The punitive damages award

Ingersoll-Rand raises various points in urging the Court to find the jury's punitive damage award of $17,460,000 excessive, bringing claims under both New Mexico and federal law. Repeating an argument it made during the trial, Ingersoll-Rand takes exception to the Court's reading of the proper legal standard for punitive damages under New Mexico law. The Court instructed the jury that it could award punitive damages if it found that Ingersoll-Rand's conduct was malicious, willful,

reckless, wanton, or grossly negligent.  Jury Instruction No. 45.  In hearing arguments on jury instructions, the Court rejected Ingersoll-Rand's claim that it should instruct the jury on gross negligence in the conjunctive, rather than the disjunctive.  New Mexico law supports the disjunctive use.  See Green Tree Acceptance, Inc. v. Layton, 769 P.2d 84 (N.M. 1989).  Despite Defendant's repeated references to contract cases, which apply a higher standard for the imposition of punitive damages, New Mexico allows the matter of punitive damages in tort to go to a jury based on gross negligence alone.  See UJI 13-1827 NMRA 1995.

Ingersoll-Rand places great reliance on Clay v. Ferrellgas, Inc., 881 P.2d 11 (N.M. 1994), cert. denied, 513 U.S. 1151 (1995), for the proposition that New Mexico requires recklessness as a minimum for punitive damages.  The Court disagrees with this argument for several reasons.  First, in Clay the trial judge instructed the jury in the conjunctive, in apparent inconsistency with the New Mexico jury instructions.  Compare Clay, 881 P.2d at 14 with UJI 13-1827 NMRA 1995.  Second, the Clay supreme court expressly declined to rule on whether it should eliminate, at the urging of the defense bar, the gross negligence standard from consideration of punitive damages.  Clay, 881 P.2d at 15 n.2.  Finally, the defendant in Clay conceded that the applicability of the gross negligence standard was not at issue in that case, and that gross negligence unquestionably could provide a basis for punitive damages.  Id.  The Court's punitive damages instruction was proper.

The Court also finds that the jury's punitive damages award in this case meets due process requirements as outlined in BMW and Continental Trend.  As the Tenth Circuit has interpreted BMW, punitive damage awards under state law may not look to prohibiting conduct in other jurisdictions.  Continental Trend, 101 F.3d at 636-37.  Moreover, in assessing a due process claim, a court must examine whether a defendant received fair notice of the conduct that will subject him

to punishment, id. at 638, and whether a defendant had fair notice of the severity of the penalty a state may impose, examining in part the degree of reprehensibility of a defendant's conduct, the ratio of the award to the actual harm a plaintiff suffered, and comparing the award with other available civil or criminal penalties.  Id.

Applying these standards here the Court disagrees with Defendant's contention that the jury's punitive damages decision violates due process.  The interests of the State of New Mexico, the protection of its citizens from extreme personal injury and the reduction of industrial accidents, are wholly served by this award.  Although the jury heard evidence of accidents involving Ingersoll-Rand milling machines that occurred in other jurisdictions, the Court admitted this evidence to show notice of alleged design defect, not liability, and the Court issued a limiting instruction to that effect. Defendant suggests that simply because there are no other milling machine accidents on record in New Mexico, this Court should infer that other states' interests were improperly served by this award. Defendants misread BMW and Continental Trend.  Each explains that evidence of out-of-state events is not irrelevant, for "such evidence is relevant to the determination of the degree of reprehensibility of the defendant's conduct."  Continental Trend, 101 F.3d at 637, quoting BMW, 517 U.S. at 574 n.21.[3]  Moreover, Ingersoll-Rand had fair notice of the conduct that would subject it to punishment. It has long been the law in New Mexico that punitive damages are available for tortious conduct.  See Colbert v. Journal Pub. Co., 142 P. 146 (1914); see also Continental Trend, 101 F.3d at 638.

Ingersoll-Rand also had fair notice of the severity of the penalty.  Under this prong of BMW,

---

[3]  The Court also notes that Ingersoll-Rand, although it objected to the punitive damages instruction, did not do so on the basis of other accidents' being improperly before the jury.  See F. R. Civ. P. 51.

courts should examine "(1) the degree of reprehensibility of the defendant's conduct, (2) the ratio of the punitive award to the actual harm inflicted on the plaintiff, and (3) the comparison between the punitive award and the civil or criminal penalties that could be imposed for comparable misconduct." Continental Trend, 101 F.3d at 638.

Ingersoll-Rand's conduct meets the required degree of reprehensibility under BMW, where the Court discussed this guidepost as being "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." BMW, 517 U.S. at 575. Here a court should

> ask whether a defendant's behavior: causes economic rather than physical harm; would be considered unlawful in all states; involves repeated acts rather than a single one; is intentional; involves deliberate false statements rather than omissions; and is aimed at a vulnerable target.

Continental Trend, 101 F.3d at 638.

Ingersoll-Rand concedes that its conduct caused physical injury, that it involved a continuing decision about a product, and that it considered alternative designs but rejected them. Ingersoll-Rand argues, however, that its conduct at most was merely negligent and should not therefore subject it to punitive damages.

The evidence presented at trial showed that Ingersoll-Rand purchased a milling machine design lock, stock and barrel, and that in its haste to become a market participant in this line of industrial equipment only performed a cursory review of its possible design defects, marketing a 40,000 pound machine that it knew required workers in close proximity in order to function as intended. Ingersoll-Rand's consultant, Mr. James Finnegan, explicitly warned that a full human factors analysis of a then-unknown quantity such as the milling machine required formal research involving hundreds of hours of effort. Yet despite this advice, Ingersoll-Rand contented itself with

an abbreviated review where Mr. Finnegan's services would not exceed $5,000 in cost. Mr. Finnegan testified that Ingersoll-Rand rejected outright the idea of placing mirrors on the milling machine without testing its assumptions that mirrors would not provide additional safety for ground operators. Plaintiff's expert Mr. Edward Karnes testified that Ingersoll-Rand never performed an adequate human factors analysis. Mr. Karnes also explained that a visibility study would have been a primary human factors concern. In addition, Mr. Karnes scoffed at Ingersoll-Rand's contention that installing mirrors on the milling machine would lead to a false sense of security that would negatively impact safety, calling it a myth and a rationalization. Although Defendant's expert Dr. Walter Reed stated that the milling machine did not need mirrors, he never disputed the expert testimony that called the design review inadequate. Indeed, Ingersoll-Rand never put mirrors on their machine to test assumptions of their deficiencies. The totality of Ingersoll-Rand's mirror study consists of one afternoon where some of its employees, walking around a milling machine, carried mirrors and assessed their effectiveness, after the <u>Rogers</u> incident prompted one of Ingersoll-Rand's customers to request the installation of mirrors on its own machine. Ingersoll-Rand's Dr. Reed conducted a much more thorough and careful study of mirror placement, but only after accidents had begun to occur and Ingersoll-Rand was facing litigation. In sum, testimony from Ingersoll-Rand's own witnesses showed that in its acquisition of a line of milling machines, Ingersoll-Rand conducted perfunctory reviews that were insufficient given the lack of accident history and that it gave short shrift to the human factors involved in the operation of those machines. Ingersoll-Rand here is advancing an argument that has failed in <u>Rogers</u>. As the <u>Rogers</u> court put it,

> [Ingersoll-Rand]'s argument, extended to its logical conclusion, is that doing nothing, but considering doing something, is enough to claim the company was not acting willfully or disregarding human safety. The Court finds this unpersuasive. If a company through its managers and officers can avoid a

> punitive damage award simply by saying "well, we thought about changing things but we decided those changes wouldn't work," then there will never be another punitive award in the history of products liability litigation. Nor will any company ever have to test, redesign, or recall a product. Thinking about, considering, or pondering doing something but then doing nothing is still *doing nothing*.

Rogers, 971 F. Supp. at 13 (emphasis in original).

Particularly given that Ingersoll Rand sold this noisy, 40,000 pound machine as one requiring the close proximity of a ground operator, the Court concludes that sufficient indicia of reprehensibility are present here to support an award of punitive damages. The injuries in this case were physical and emotional, not merely economic, and is therefore more worthy of a large punitive damage award. See Continental Trend, 101 F.3d at 638, 639. Ingersoll Rand's conduct took place over many months in the early 1980's, and once on notice of visibility problems that resulted in catastrophic injuries, notably from the Ledgerwood and Rogers accidents, Ingersoll-Rand did nothing to correct the situation. Ingersoll Rand did not act so deliberately as the defendant in Continental Trend, yet its acts and omissions resulted in great harm to a very vulnerable target, the groundman who was a necessary component of the machine's proper functioning and who could not be seen or heard by the machine's operator. Thus, although not all indicia outlined by the BMW Court are present with respect to reprehensibility, the Court concludes that Ingersoll-Rand's conduct was sufficiently reprehensible to satisfy the BMW requirements.

The second indicium of fair notice of the penalty imposed, the ratio of the punitive award to the actual harm inflicted on the plaintiff, also counsels for a finding of constitutionality. The relevant ratio to apply here is one that focuses on "the actual harm inflicted on the plaintiff," Continental Trend, 101 F.3d at 640, quoting BMW, 517 U.S. at 580, and while what is constitutional is not

"marked by a simple mathematical formula," BMW, 517 U.S. at 582, Continental Trend suggests that

a ratio of ten to one is not excessive in economic injury cases, Continental Trend, 101 F.3d at 639,

while BMW seems to require a smaller ratio. Id.  Whatever the differences that exist between cases

that involve only economic injury and those, such as this one, that address personal injury, the Court

need not draw a line today.  For the ratio of punitive to compensatory damages at approximately two

to one in the present case is comfortably within the limits set out in BMW and Continental Trend.[4]

A two to one ratio is "hardly the work of a runaway jury."  See Williamson v. Handy Button Mach.

Co., 817 F.2d 1290, 1296 (7th Cir. 1987).

Because of the factual differences in this case from BMW and Continental Trend, which are

both economic harm cases, the third indicium of fair notice of a penalty, a "comparison between the

punitive award and the civil or criminal penalties that could be imposed for comparable misconduct,"

Continental Trend, 101 F.3d at 638, does not directly apply.  See id. at 641.  In tort cases, rather, the

Tenth Circuit has construed this guidepost as requiring determination of whether a tortfeasor had

reasonable notice that its tortious conduct "could result in such a large punitive award."  Id.  The

Continental Trend court compared other cases in order to ascertain whether the tortfeasor had fair

notice of the possibility of a large award.  Ingersoll-Rand urges the Court to engage in such a

comparison and argues that there is a paucity of recorded cases with large punitive verdicts, pointing

to a treatise that compiles noteworthy cases.  Large product liability punitive awards, however, are

not unknown.  In Mason v. Texaco, 948 F.2d 1546 (10th Cir. 1991), cert. denied, 504 U.S. 910

(1992), the court ordered a remittitur of $12.5 million from an award of $25 million.  Id. at 1561.

_____

[4]  The Court need not, and does not, decide whether a punitive damage award is appropriate only for Mr. Smith's injuries, or may include Mrs. Smith's loss of consortium and other damages in its calculation.

In Batteast v. Wyeth Laboratories, Inc., 526 N.E.2d 428 (Ill. App. Ct. 1988), rev'd on other grounds, 560 N.E.2d 315 (Ill. 1990), the court affirmed an award of $13 million. Lastly but importantly, the Rogers appellate panel affirmed the jury's award of $6.5 million against Ingersoll-Rand as punitive damages for the injuries in that case. Rogers, 144 F.3d at 842. In part because of the inherent inconsistency litigants can expect in jury results, Mason, 948 F.2d at 1561, the Court will not require an exact comparative award to be extant before finding that a manufacturer should be on notice of its potential liability. These cases cited plainly put Ingersoll-Rand on fair notice that its conduct can result in large punitive awards.[5]

C.  The Court's rulings.

1.  the evidentiary rulings

Re-treading on ground well worn by motions in limine and trial rulings, Ingersoll-Rand argues that the Court erred in some of its evidentiary decisions. Specifically, Defendant maintains that the Court should not have allowed evidence of other accidents involving its milling machines introduced to show both notice of a defect and product defect in Mr. Smith's case. Ingersoll-Rand further states that this evidence was unduly prejudicial, and also argues that the Court improperly admitted communications between District Paving and Ingersoll-Rand that took place following the Rogers accident. The Court addressed both matters before trial.

A court may not simply revisit evidentiary rulings from a clean slate. Rule 61 mandates that

> no error in either the admission or the exclusion of evidence and no error or
> defect in any ruling or order or in anything done or omitted by the court or by

---

[5] Although not a basis for the Court's ruling, the Court notes that fair notice to a manufacturer of product defects should come not only when large punitive verdicts start to appear on the legal landscape, often many years after an injury, but when serious injuries begin to occur that signal the need to re-examine a product design.

> any of the parties is ground for granting a new trial or for setting aside a
> verdict or for vacating, modifying, or otherwise disturbing a judgment or
> order, unless refusal to take such action appears to the court inconsistent with
> substantial justice. The court at every stage of the proceeding must disregard
> any error or defect in the proceeding which does not affect the substantial
> rights of the parties.

Fed. R. Civ. P. 61.

In this case, the Court allowed the introduction of other accidents to show notice of design defect based upon their substantial similarity with the circumstances of Mr. Smith's case. The Court sees no reason to disturb this ruling.

In a product liability action, "courts routinely permit introduction of substantially similar acts or occurrences... to demonstrate the existence of a defect [or] to prove notice." C.A. Associates v. Dow Chemical Co., 918 F.2d 1485, 1489 (10th Cir. 1990). Substantial similarity is dependent upon the theory of the case, Ponder v. Warren Tool Corp, 834 F.2d 1553, 1560 (10th Cir. 1987), for "[d]ifferences in the nature of the defect may affect a determination [of] whether the accidents are substantially similar." Id. Where evidence is offered to show notice, as here, "a lack of exact similarity of conditions will not cause exclusion provided the accident was of a kind which should have served to warn the defendant." Id.; see also Four Corners Helicopter, Inc. v. Turbomeca, S.A., 979 F.2d 1434, 1440 (10th Cir. 1992).

Although there are some differences between the machine in this case and those involved in other accidents, those differences are not enough, under the facts here, to affect substantial similarity for purposes of notice. Ingersoll-Rand argues that other accidents in this case involved a somewhat larger machine which ran on tracks rather than wheels. Testimony at trial revealed that Ingersoll Rand developed this machine from the model which injured Mr. Smith after concluding that wheeled

milling machines could not provide enough traction to satisfy its high volume customers. Yet a central issue at trial was the lack of visibility on the accident machine, and the accidents Plaintiffs introduced all involved lack of visibility with machines that were very similar to the accident machine.[6] The tire of a milling machine struck Mr. Smith while its operator reversed the machine to reposition it. In the 1993 Alexander accident a milling machine, moving in reverse, struck Mr. Alexander. In the 1994 Johnson accident, Mr. Johnson was injured when he allegedly attempted to dislodge a ski stuck in a pothole with his foot while a machine also was moving in reverse. In the 1990 Ledgerwood accident in Canada Mr. Ledgerwood died when a milling machine, also moving in reverse, turned to set up for another cut. In the 1994 Madden accident the left track of a milling machine ran over Mr. Madden's foot, again while moving in reverse. In the 1992 Rogers accident, a reversing machine struck Ms. Rogers while she was flagging traffic. Finally, in the 1994 Washington accident, a milling machine track ran over Mr. Washington's foot when its operator moved the machine forward. Given that "[t]he requirement of similarity is relaxed... when the evidence of other incidents is used to demonstrate notice or awareness of potential defect," Four Corners, 979 F.2d at 1440, and that identical conditions are not required, see id. at 1439-40, the Court sees no substantial injustice caused by its evidentiary ruling.

Nor did this evidence present unfair prejudice to Defendant. "The standard for exclusion under Fed. R. Evid. 403 is somewhat exacting." C.A. Associates, 918 F.2d at 1489. Excluding evidence under Rule 403 is an extraordinary remedy which courts should use sparingly. Id. at 1490

---

[6] Both wheeled and track machines use the same layout with a central operator platform, located atop a cutting drum, where the driver walks freely from side to side. Both have a forward-mounted boom to discharge milled material, both lack mirrors, both have visibility issues associated with their design, and both require a groundman to work in their close proximity.

(citations omitted ). In this instance the Court found the evidence of other accidents both relevant and admissible. That it may have been detrimental to Ingersoll-Rand is not sufficient for exclusion, since "[t]he danger of unfair prejudice under Rule 403 is not simply the tendency of evidence to undermine a party's position." United States v. McVeigh, 1998 WL 568351 at * 17 (1998). Because of the extensive rebuttal testimony Ingersoll-Rand presented on other accidents, the Court finds that its probative value was not substantially outweighed by the danger of unfair prejudice.

With respect to the communications between Ingersoll-Rand and District Paving, Defendant argues that the safety issues District Paving raised, including the design of the cutting drum and the lack of a back-up alarm, were not at issue here and thus not relevant. Ingersoll-Rand also argues that the Court should not have allowed evidence that showed District Paving's installation of mirrors on its milling machines. At to the first contention, the back-up alarm was an acknowledgment of a visibility problem–it served to warn other workers the driver could not see. The design of the cutting drum also was relevant because of the close proximity of ground workers to the milling machine. As to the second, District Paving's installation of mirrors was properly admitted. Under the evidentiary law controlling subsequent remedial measures, a court can allow evidence of remedial actions if those actions were not taken by a defendant, but by a third party. Raymond v. Raymond Corp., 938 F.2d 1518, 1524 (1st. Cir. 1991); Taylor v. St. Louis Southwestern Railway Company, 746 F. Supp. 50, 52-53 (D. Kan. 1990). Moreover, even if this evidence were to constitute subsequent remedial measures, Rule 407 has limited applicability in strict liability cases. Plaintiffs may properly introduce such evidence, under a narrow construction of the rule, for purposes other than to show Defendant's negligence. Herndon v. Seven Bar Flying Service, Inc., 716 F.2d 1322, 1331 (10th Cir. 1983), cert. denied sub nom., Piper Aircraft Corporation v. Seven Bar Flying Service, Inc., 466 U.S. 958 (1984).

2. The jury instructions

Ingersoll-Rand argues here that the Court erred in instructing the jury on three defect claims: the lack of a wheel guard, the lack of a guard on the opening behind the wheel, and the lack of a kill switch on the milling machine. Defendant essentially argues that there was insufficiently competent evidence presented at trial to support such instruction.

A court should give jury instructions "only if they are supported by competent evidence." Federal Deposit Insurance Corp. v. UMIC, Inc., 136 F.3d 1375, 1382 (10th Cir. 1998). "There must be more than a mere scintilla of evidence to support an instruction." Farrell v. Klein Tools, Inc., 866 F.2d 1294, 1297 (10th Cir. 1989). In this case, the record amply demonstrates that there was sufficient evidence to support instructing the jury on guarding the machine's wheels and large opening behind the wheels as well as the installation of a kill switch.

Three Plaintiffs' experts testified and were cross-examined on those issues. On November 12, Mr. Gallagher testified at length about safety concerns and guarding issues in general. On November 11 and 12, Mr. Hathaway testified with respect to a kill switch, guarding the large opening behind the wheels and guarding the front wheels themselves. On November 13, Dr. Karnes testified with respect to guarding the large opening. This testimony easily rises to being sufficient competent evidence that supported instructing the jury on those issues.

D. The Jury's Exposure to easel pages from the trial

Upon discovering that materials other than properly admitted evidence were in the presence of the jury during its deliberations, a court should hold "a hearing to determine the circumstances of the improper contact and the extent of prejudice, if any." United States v. Hornung, 848 F.2d 1040, 1045 (10th Cir. 1988), cert. denied, 489 U.S. 1069 (1989); see also United States v. Sanchez-Sotelo,

8 F.3d 202, 213 (5th Cir. 19930, <u>cert</u>. <u>denied</u>, 511 U.S. 1023 (1994); <u>United States v. Simpson</u>, 950 F.2d 1519 (10th Cir. 1991). In this case, the Court conducted two hearings, one with jury foreperson Mr. Daniel Rivera and one with juror Ms. Darla Ashley.

The scope of the court's questioning of jurors necessarily is circumspect. Pursuant to Fed. R. Evid. 606(b),[7] a juror may "testify as to *whether* any extraneous prejudicial information was brought to bear upon a juror. However, the language of the rule is equally clear that a juror may not testify as to the *effect* the outside information had upon the juror." <u>Simpson</u>, 950 F.2d at 1521 (emphasis in original). Thus, a court must draw a bright line between inquiring into the thought processes of jurors, and inquiring into the existence of conditions or the occurrence of events which might have exerted an improper influence on the verdict.

Mr. Rivera's testimony did not reveal conclusively whether the jury had seen all the easel pages at issue, or indeed whether it had seen any. Mr. Rivera stated that he remembered the jury's using the easel to write on some blank pages, and that other pages were "probably just flipped over." But he also stated that the jury might have looked at the page with Mr. Smith's damages figures (exhibit 1). He further testified that the jury was together at all times, whether deliberating or taking a break. Mr. Rivera, then, did not shed much light on the issue.

---

[7] The rule states:

 (b) Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Because Mr. Rivera had indicated that Ms. Ashley was the jury's scribe, however, the Court held a second evidentiary hearing where it questioned Ms. Ashley. This hearing also revealed little information. Ms. Ashley initially confused the easel pages in question with other pages which, created during the trial, had properly been admitted into evidence by the Court. Ms. Ashley then testified that she does remember putting a question mark on exhibit 1, near the amount for counseling costs. Ms. Ashley did not remember anything else.

Based upon these two interviews, the fact that the easel was discovered with all its pages flipped back, and that only the page which the Court has labeled exhibit 1 contained writing which can be attributed to the jury, the Court finds that the jury at most was exposed to exhibit 1 during its deliberations. The Court will assume, however, that the jury saw all the pages at issue while in the jury room.

The Tenth Circuit Court of Appeals has provided somewhat conflicting guidance as to the standard to apply in analyzing the possible prejudicial effect of extraneous materials. United States v. Aguirre, 108 F.3d 1284 (10th Cir. 1997), cert. denied, 118 S.Ct. 335 (1997), states that "a jury's exposure to extrinsic information gives rise to a rebuttable presumption of prejudice," id. at 1288, where "[t]o overcome this presumption, the [nonmoving party] must prove the jury misconduct was harmless." Id. Two previous cases explain that "[a] new trial is warranted when there [is] the 'slightest possibility' that viewing the unadmitted evidence affected the verdict." United States v. Jaramillo, 98 F.3d 521, 525 (10th Cir. 1996), cert. denied, 117 S.Ct. 499 (1996), citing United States v. Wood, 958 F.2d 963, 966 (10th Cir. 1992) (as amended). Simpson, in referring to a juror's seeing a defendant in handcuffs, instructs that a "court must apply an objective test, assessing for itself the likelihood that the influence would affect the typical juror," Simpson, 950 F.2d at 1522, while

commenting that "certain types of extraneous juror information create a rebuttable presumption of prejudice." Id. Moreover, in explaining the "slightest possibility" standard Wood explains that it is not as exacting as some other circuits' "reasonable possibility" standard. Wood, 958 F.2d at 966. Lastly, in the civil context the Tenth Circuit has held, drawing analogies from criminal cases, that "a rebuttable presumption of prejudice arises whenever a jury is exposed to extraneous information." Mayhue v. St. Francis Hosp. of Wichita, Inc., 969 F.2d 919, 922 (10th Cir. 1992). Not all controlling case law, then, is in agreement on the precise standard to apply.

There is clear indication from the circuit, however, that in making its determination of prejudice a trial court must "assess the possibility of prejudice by reviewing the entire record, analyz[e] the substance of the extrinsic evidence, and compar[e] it to that information of which the jurors were properly aware." Hornung, 848 F.2d at 1045; see also Mayhue, 969 F.2d at 923-24; Aguirre, 108 F.3d at 1288; Wood, 958 F.2d at 966-67; Jaramillo, 98 F.3d at 525. Despite Aguirre's "rebuttable presumption" standard's being the latest pronouncement from the circuit, the Court will apply the stricter "slightest possibility" standard to its analysis and assume that this standard is still good law. Yet even under this "slightest possibility" standard the Court finds, after reviewing the entire record and analyzing the substance of the easel pages, that there is not the slightest possibility that Ingersoll-Rand was prejudiced by the presence of the easel pages in the jury room.

As Ingersoll-Rand rightly points out, the most important issue in a case of jury consideration of extraneous evidence must be the type of extraneous evidence involved in that case. Here, an objective review of the entire record shows that the jury was properly made aware during trial of each and every piece of information on the easel pages, and that all the information on those pages was "cumulative and duplicative of other evidence." Jaramillo, 98 F.3d at 525.

For exhibit 1, the jury had a stipulated exhibit as to the reasonableness and cost of the Ron Smith's past medical expenses. Plaintiffs' Exhibit 653. For the prosthesis costs, the jury heard testimony of Mr. Myers, and had the benefit of Plaintiffs' Exhibits 650 and 651, which gave detailed costs and expected duration of the various components of Ron Smith's prosthesis. For Ron Smith's past wages, the jury had the testimony of Stan Smith and Plaintiffs' Exhibit 654, calculated by Dr. Smith, and Plaintiffs' Exhibit 661, created at trial. For loss of past household services of Ron Smith, the jury heard Stan Smith's testimony and could examine Plaintiffs' Exhibits 658 and 661. For future household services, the jury had Plaintiffs' Exhibits 659 and 661 to rely on. For future loss of earnings, the jury could look to Plaintiffs' Exhibit 656. It is only for Ron Smith's counseling costs that the jury did not have an exhibit provided to them. There the $150,000 figure, however, came from the testimony of Dr. Varni. Thus, for exhibit 1, all of the numbers at issue were properly presented at trial and all but one were also available in other admitted exhibits.

Likewise, exhibit 3 of the easel pages did not present novel information to the jury. Lucy Smith' s past wages were part of Plaintiffs' Exhibit 655, calculated by Stan Smith, and Plaintiffs' Exhibit 661, created at trial. Like Ron Smith's counseling costs, Lucy Smith's future counseling costs of $150,000 were part of the testimony of Dr. Varni, although again there were no exhibits available to the jury for this figure.

Because the Court allowed the jury to take notes during the trial, the Court finds that while these exhibits are a recapitulation of damage figures that was not consolidated until closing arguments and its presentation on these pages, the duplicative nature of the exhibits did not present the slightest possibility that their presence affected the verdict. The jury was exceptionally attentive throughout the trial. Indeed, the courtroom deputy reported that at one point the jury was not "getting along"

because 7 of their members thought that the other 2 were not paying sufficient attention.

The rest of the easel pages were not as suggestive as exhibits 1 and 3, and none presented cost figures. Exhibit 2, created during Plaintiffs' closing arguments, merely stated two bases for damages, pain and suffering and "enjoyment of life." Plaintiffs' medical experts, hedonic damages expert Stan Smith, and Plaintiff's closing arguments all covered this ground. In addition, both these bases were discussed openly and at length during the trial, and expressly stated in the jury instructions. See Jury Instruction No. 40.

Exhibit 9 encompassed the Plaintiff's design defect theories of negligence. These theories all formed an essential part of the jury instructions, Jury Instruction No. 16, and were the subject of lengthy testimony by both Plaintiff and Defendant witnesses throughout the trial.

All the other easel pages addressed the issue of damages. Exhibits 4 and 5 enumerated the risk and resistance factors which, in Dr. Varni's opinion, can contribute to the fragility of Ron and Lucy Smith's psychological health. None of this information was new for the jury.

Exhibits 7 and 8 addressed damages calculations. Again, none of this evidence was new for the jury, since Stan Smith testified to it at trial. The language of exhibits 7 and 8 merely served as a guide or an example, and was not nearly as explicit as admitted exhibits which suggested actual numbers for future loss of household services and future wages. See, e.g., Plaintiff's Exhibits 656, 659, 660, 661. Exhibits 7 and 8 are cumulative of other properly admitted evidence.

Lastly, exhibit 6 presented wording that attempted to convey criteria to consider when the jury addresses loss of enjoyment of life. Looking to the substance of this evidence, Hornung, 848 F.2d at 1045, it parceled some of the different categories that might constitute, as a whole, the

enjoyment of life. These considerations duplicated the testimony of Ron Smith, Lucy Smith, the "day in the life" video, and other witnesses who discussed Ron Smith's occupation, his other activities, and how his injury affected his sense of well-being and self esteem.

In sum, all these pages, taken either alone or together, show that the jury's consideration of them could not lead to the slightest possibility of prejudice. All of their information, either in form or substance, was properly before the jury as trial testimony, in many instances spoken by more than one witness. Some of their information was contained in the Court's own jury instructions. Almost all of the information in them was otherwise available to the jury in the jury room as properly admitted exhibits or stipulations. One isolated damage value, for Ron and Lucy Smith's counseling costs, can not be found in another exhibit, yet it was the subject of testimony at trial. Finally, the damages figures on the easel pages included an amount for medical expenses to which Ingersoll-Rand stipulated, were small compared to the verdict the jury returned, did not contain any number for pain and suffering or loss of enjoyment of life, and only reflected amounts that Ingersoll-Rand now concedes are valid as "hard" damages in this case. Viewing all the easel sheets after a review of the entire record, then, analyzing the substance of their extrinsic evidence, and comparing them to the information otherwise properly before the jury, the Court finds that there is not the slightest possibility that this evidence affected the verdict.

Ingersoll-Rand suggests that <u>Wood</u> is dispositive. In <u>Wood</u> an easel from trial, containing at least twenty pages of notes, also was taken into a jury room. <u>Wood</u>, 958 F.2d at 965. "Page twenty of the notes highlighted four dates and events which were significant to the government's case and which corresponded to a timeline that the government counsel prepared and used during closing argument." <u>Id.</u> During its deliberation the jury had requested to see the timeline, which was a critical

part of the government's case, id. at 966-67, but the trial judge had refused the request. Id. at 966. In part because the jury received material which the trial court had expressly denied it, the Wood court found that it was not abuse of discretion to grant a new trial. Id. at 967.

The facts here are markedly different. All of the information on the easel pages had been previously admitted at trial, and was duplicative or cumulative of trial testimony. Some of the information was contained in the Court's jury instructions. The jury never suggested, as the Wood jury implicitly did, that it needed more information to reach its verdict, and then received that information contrary to the Court's order. In addition, the Court in this case allowed the jury, who was particularly attentive, to take notes throughout the trial. The circumstances of the jury's exposure to easel pages here, then, differ significantly from the facts in Wood, and the Court concludes that the facts in this case sufficiently distinguish it from Wood to lead to a different result.

II.   Plaintiffs' Motions for Pre- and Post-Judgment Interest

Originally seeking pre-judgment interest on the punitive damage award, Plaintiffs now concede that under New Mexico law this interest is not available and withdraw their request. See Weidler v. Big J Enterprises, Inc., 953 P.2d 1089 (N. M. Ct. App. 1997). For its part, Ingersoll-Rand agrees that post-judgment interest on both the compensatory and punitive damages awards is proper. The federal interest rate applies here, see Everaard v. Harford Accident & Indemnity Co., 842 F.2d 1186, 1193-94 (10th Cir. 1988), and the Court will amend the judgment to reflect a post-judgment interest rate of 5.468%, the rate in effect immediately before the entry of judgment. See 28 U.S.C. § 1961 (1998). The issue that remains, then, is whether Plaintiffs are entitled to recover pre-judgment interest on the compensatory damage award.

The Court looks to New Mexico law to decide issues of pre-judgment interest. Strickland

<u>Tower Maintenance v. AT&T Communications, Inc.</u>, 128 F.3d 1422, 1429 (10th Cir. 1997). New

Mexico explicitly allows the award of pre-judgment interest

> of up to ten percent from the date the complaint is served upon the defendant
> after considering among other things:
> (1) if the plaintiff was the cause of unreasonable delay in the adjudication of
> the plaintiff's claims; and
> (2) if the defendant had previously made a reasonable and timely offer of
> settlement to the plaintiff.

N.M. Stat. Ann. 56-8-4(B) (Michie 1996).

These two factors to consider are not exclusive, and a "trial court should take into account all

relevant equitable considerations that further the goals of Section 56-8-4(B)." <u>Gonzales v. Surgidev</u>

<u>Corp.</u>, 899 P.2d 576, 593 (N.M. 1995).

Based upon this guidance from New Mexico case law, the Court will grant the request for an

award of pre-judgment interest. Plaintiffs allege not having caused unreasonable delay in this action,

pointing out that they promptly began discovery in February, 1995, that due to complex issues

discovery was extended on joint motion of the parties, and that the trial delays that occurred did not

come at Plaintiffs' suggestion. Defendant offers nothing in rebuttal, instead stating that it was not

responsible for delay. Defendant's argument is misplaced; the statute makes no mention of a

defendant's diligence with respect to delay, but rather asks solely whether a plaintiff caused an

unreasonable delay. The first statutory requirement is met.


Plaintiffs also convincingly show that Defendant's settlement offers were neither timely nor

reasonable. Ingersoll-Rand extended two offers in this case. Defendant is silent about the first, but

does not deny that it made a $100,000 offer on November 4, 1996. This offer, coming over two

years after Plaintiffs' filed their complaint, over three and-a-half years after Mr. Smith's accident, and

with what must have been significant knowledge of the extent of Mr. Smith's injuries, was plainly

insufficient. Ingersoll-Rand's only other offer, extended on October 16, 1997, less than three weeks

before trial, also fell short of an objective standard of reasonableness. This second offer proposed

a $200,000 cash payment and the investment of $447,000 on Plaintiffs' behalf. Although these

amounts are significantly more than the 1996 offer, they were still unreasonable in light of Plaintiffs'

substantial injuries and losses. Indeed, Defendant was on notice that this case could potentially return

a much larger verdict, for in the Rogers case in the summer of 1997 a District of Columbia jury

awarded Mrs. Rogers almost seventeen million dollars.[8] Defendant's structured settlement offer,

then, involving protracted payments with a $200,000 lump sum and a $447,000 capitalization, was

unquestionably unreasonable. Accordingly, pursuant to New Mexico law under which pre-judgment

interest exists "to foster settlement and prevent delay," Gonzales v. Surgidev Corp., 899 P.2d at 593

(emphasis removed), the Court will award the full statutory allowance for pre-judgment interest from

December 14, 1994, the date of Plaintiffs' request, to December 19, 1997, the date of entry of

judgment.

Ingersoll-Rand argues, citing little supporting case law, that New Mexico's pre-judgment

interest statute is unconstitutional[9] because it interferes with its right to a jury trial, it attempts to

_____

[8] See Rogers, 971 F. Supp. at 4. The Court recognizes, of course, that Mrs. Rogers sustained different
though extensive injuries in an accident that was similar yet not identical. For purposes of the valuation of Mr.
and Mrs. Smith's case, however, the Rogers litigation offers sufficient guidance to clearly have put Ingersoll-Rand
on notice that its offers to Mr. and Mrs. Smith were insufficient.

[9] Defendant implicitly claims unconstitutionality under both the United States and New Mexico
Constitutions.

control the judiciary and the practice of law, and it is impermissibly vague. Courts must, of course, avoid interpreting statutes as unconstitutional if there is another reasonable interpretation available. Edmond v. United States, 520 U.S. 651 (1997).

However, the Court fails to see how the statute interferes with the right to a jury trial. As an incentive to settlement, the statute does not control the right to a jury trial any more than does the award of costs to a prevailing party. Moreover, the uncertainties of the trial process are themselves powerful incentives to settlement, and the inherent doubts about a case's outcome, growing as trial approaches, affect the calculus of going to trial in a much more significant manner than the looming possibility of pre-judgment interest. Lastly, where pre-judgment interest looks to encouraging settlement on the part of a defendant, offers of judgment perform the same function vis-a-vis a plaintiff. See F. R. Civ. P. 68; Rule 1-068 NMRA 1992. Therefore, other than advancing bare argument totally unclothed by references to case law, Defendant fails to explain in a manner the Court can appreciate how an incentive to settle a case tramples on its right to a jury trial.

Likewise, the Court does not see how the statute engenders a separation of powers conflict. Ingersoll-Rand claims that the statute forces it to reveal confidential communications concerning settlement offers in responding to motions for pre-judgment interest, thus impermissibly transgressing on the judiciary's constitutional prerogative to regulate practice and procedure in the courts. See Ammerman v. Hubbard Broadcasting, Inc., 551 P.2d 1354 (N.M. 1976), cert. denied, 436 U.S. 906 (1978). Defendant's argument is wide of the mark, for nowhere does the statute, either expressly or implicitly, command the revelation of confidences. A settlement offer is or is not reasonable of its own weight, regardless of the offeror's opinion of the matter. Section 56-8-4(B) is completely silent on **subjective** reasonableness, and Defendant does not cite a single case even remotely touching on

his subjectivity argument.

Finally, the pre-judgment interest statute is not void for vagueness. Defendant argues that what is timely or what is reasonable are unreasonably vague concepts. The irony of this argument is patent, for Defendant does no more provide a definition of reasonable than the statute. Yet definitions are available. <u>See</u> Black's Law Dictionary 1265 (6th ed. 1990). Whatever its deficiency due to lack of specificity, if any, Section 56-8-4(B) sets out a standard to follow which has not troubled courts in the past, <u>see</u>, <u>e.g.</u>, <u>Gonzales</u>, 899 P.2d at 593, and does not trouble this Court now.

III.   Plaintiffs' Appeal of Clerk's Order Settling Costs

Plaintiffs are aggrieved by the Clerk's exclusion, in its cost order, of certain expert witness fees, costs for a "day in the life" video, costs of photographic enlargements, medical enlargements, a model of the milling machine, and certain depositions not used at trial. The Court addresses these claims seriatim.

Although the Court did not appoint any of Plaintiffs' experts, <u>see</u> 28 U.S.C. § 1920 (1994), Plaintiffs nevertheless ask the Court to use its discretion and allow the taxing of expert witness fees in excess of the statutory mandates.[10] This the Court can not do. It is clear that whatever discretion Fed. R. Civ. P. 54(d) vests in the Court, this discretion does not extend to going beyond the plain language of § 1920, and that the taxing of non-appointed expert fees is not possible. <u>Crawford Fitting Co. v. J.T. Gibbons, Inc.</u>, 482 U.S. 437, 442, 445 (1987); <u>Chaparral Resources, Inc. v. Monsanto Co.</u>, 849 F.2d 1286, 1292 (10th Cir. 1988). Moreover, Plaintiffs can not, in this diversity case, point to any provision of New Mexico law which mandates the taxing of expert fees, and which consequently would permit taxing under the present procedural posture. <u>See</u> <u>Chaparral</u>, 849 F.2d

---

[10]   The Court considers Plaintiffs' visibility study to fall under the rubric of expert testimony.

at 1292; N. M. Stat. Ann. § 38-6-4 (Michie 1987). While the Court agrees with Plaintiffs that complex cases can not reasonably proceed without each party's introduction of expert testimony, Plaintiffs can not prevail here.[11]

Costs for the "day in the life" video, however, are taxable. In support of their objections Plaintiffs argue that the video helped inform the jury, citing Board of Directors, Water's Edge v. Anden Group, 135 F.R.D. 129 (E.D. Va. 1991). There the court allowed taxing of the costs of a video showing plaintiff's "chief expert witness inspecting [a] roof and pointing out evidence allegedly establishing [defendant's] liability." Id. at 137. The court found that this evidence made the case more intelligible to the jury, thereby saving trial time. Id. In Plaintiffs' case here, the Court reaches the same conclusion. Although both Mr. and Mrs. Smith testified at length about the consequences of the accident, and Plaintiffs and Defendant put on expert witnesses who thoroughly explained or rebutted the extent of both the physical and psychological trauma Mr. and Mrs. Smith have suffered and will continue to suffer, the video nevertheless was an important depiction of Mr. Smith's daily efforts. Moreover, the video showed the jury what they otherwise did not see: Mr. Smith's struggle with his prosthetic equipment, his difficulties with clothing, and the way he has adapted to the routine around his home. The video also helped to illustrate the testimony of medical and rehabilitation professionals who described the trouble Mr. Smith was having in adjusting to his prosthetic leg. The "day in the life" video, which the Court edited out of concern for its possible prejudicial effect, nevertheless added considerably to the testimony and rises to the level of helpfulness explained in Water's Edge.

---

[11] The Court notes that the taxing of costs is a two-way street, where a losing personal injury plaintiff may ill be in a position to pay a defendant's costs.

The Court also will permit the taxing of photographic and medical enlargements and the cost of the model of the milling machine. Because of the position of the witness box relative to the jury, the enlargements were helpful and facilitated the expeditious conduct of the trial. Time and again both Plaintiffs' and Defendant's witnesses referred to the enlargements or illustrated their testimony by pointing to specific locations on Plaintiffs' model. Indeed, Ingersoll-Rand and Plaintiffs made equal use of the model. Therefore, the enlargements and the model were exemplifications necessarily obtained for use in the case, 28 U.S.C. § 1920(4) (1998), and as such the Court will authorize, pursuant to D.N.M. LR.-Civ 54.2(f), the taxing of their associated costs.

With respect to the taxing of costs for depositions not used at trial, the Court is guided by the recent Tenth Circuit decision in Callicrate v. Farmland Industries, Inc., 139 F.3d 1336 (10th Cir. 1998). Callicrate, although not squarely on point, explains that "caution and proper advocacy may make it incumbent on counsel to prepare for all contingencies which may arise during the course of litigation which include the possibility of trial." Id. at 1340. Callicrate goes on to state that it would be inequitable to penalize a prevailing party if depositions, ultimately not having a bearing on the litigation, "appeared otherwise necessary at the time [they were] taken for the proper preparation of the case." Id. Callicrate then holds that a determination of whether depositions were necessarily obtained for use in a case must be "made based on the particular facts and circumstances at the time the expense was incurred." Id.

Measured by this standard, the Court finds that Plaintiffs' deposition costs of Wilfred Van Gorp, Ph.D., David McDaniel, Randy Torman, and Charles S. Veskema are taxable. Plaintiffs aver, and Ingersoll-Rand does not dispute, that these depositions "were reasonably necessary for use in the Plaintiffs' case, at the time each deposition was taken. The depositions were used to prepare direct

and/or cross examination of witnesses, to impeach witnesses, to read testimony into evidence at trial and/or for other uses at trial." Plaintiffs' Cost Bill and Supporting Memorandum [Doc. No. 338] at 5-6. Although the Court, pursuant to <u>Callicrate</u>, would have liked more specificity on the circumstances of these depositions, the Court finds that given the complexity of this case Plaintiffs' counsel acted within the diligence required to prepare for all contingencies which could have arisen during the prosecution of this action, and that consequently the depositions fall within the standard <u>Callicrate</u> established.

**THEREFORE,**

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Pre-Judgment and Post-Judgment Interest on the Compensatory and Punitive Damage Judgment Entered Against Defendant, Ingersoll-Rand Company, filed December 15, 1997 **[Doc. No. 318]** be, and hereby is, **granted in part**, that Plaintiffs' Motion to Amend or Alter Judgment to Include Pre-Judgment and Post-Judgment Interest, filed December 31, 1997 **[Doc. No. 323]** be, and hereby is, **granted**, that Plaintiffs' Objection and Appeal of Clerk's Order Settling Costs, filed July 7, 1998 **[Doc. No. 357]** be, and hereby is, **granted in part**, and that Defendant Ingersoll-Rand Company's Motion for a New Trial, Renewed Motion for Judgment as a Matter of Law, and Motion for Remittitur, filed January 5, 1998 **[Doc. No. 326]** be, and hereby is, **denied**.

**IT IS FURTHER ORDERED** that Plaintiffs prepare and submit to the Court after review by Defendant, within ten days of the filing of this memorandum opinion and order, an order reflecting the Court's rulings on their appeal of costs.

**IT IS FURTHER ORDERED** that the judgment be, and hereby is, **amended** to include the

following interests, to be merged into the original judgment:

Post-judgment interest of 5.468 percent on both the compensatory and punitive damages awards, and pre-judgment interest on the compensatory damage award only of ten (10) percent to run from December 14, 1994 to December 19, 1997.


_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE


Counsel for Plaintiffs                    Counsel for Defendant

Esteban A. Aguilar , Esq.                 Stephen M. Williams , Esq.
James A. Branch Jr., Esq.                 William H. Robinson Jr., Esq.
Michael Aaronson , Esq.

# APPENDIX A

Exhibit 1

Ron

| | |
|---|---|
| Med. Exp. | $227,512.00 |
| Counseling | 150,000.00 |
| Prosthesis | 416,000.00 |
| Wages(past) | 65,000.00 |
| Household (past) | 25,899.00 |
| (future) | 148,107.00 |
| Loss of earnings | 404,000.00 |
| (future) | |

Loss of enjoyment

Exhibit 2

Ron

Pain & Suffering
Enjoyment of life

Exhibit 3

Lucy

| | |
|---|---|
| Counseling | $150,000.00 |
| Past wages | 63,000.00 |
| Consortium— | |

Exhibit 4
1. Degree of limb loss
2. Functional independence
3. Self esteem
4. Perceived competence
5. Cognitive functioning

RISK FACTORS

Exhibit 5

<u>Resistance Factors</u>

   1. Perceived Social Support
   2. Family functioning
   3. Resources– utilitarian
      a) social
      b) economic

Exhibit 6

LOSS OF
ENJOYMENT

   1) <u>OCCUPATION</u>
   2) DAILY
   3) LEISURE
   4) INTERNAL

Exhibit 7

PAST
<u>BASE</u>
<u>GROWTH</u>
<u>DISCOUNT</u>

Exhibit 8

<u>HOUSEHOLD</u>
<u>HOURS x 365</u>
HOURLY RATE

Exhibit 9

   1. ski–dual purpose
   2. visibility
   3. large openings
   4. unguarded front wheel
   5. no kill switch